**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

CHRISTOPHER E. SPURLOCK,

      Plaintiff,

v.                                  CIVIL ACTION NO. 3:19-cv-00476

ANDREW SAUL,[1]
Commissioner of Social Security,

      Defendant.

## **PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Christopher E. Spurlock ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  By standing order entered on January 4, 2016, and filed in this case on June 26, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.) Presently pending before this Court are Claimant's motion for judgment on the pleadings and supporting memorandum (ECF Nos. 13, 14) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 15).

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request to reverse the Commissioner's decision (ECF No. 13), **DENY** the Commissioner's request to affirm his decision (ECF No. 15), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter to the Commissioner for further proceedings.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 39 years old at the time of his alleged disability onset date and 43 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 1040.)[2]  He is a high school graduate. (*Id.* at 1044, 1294.)  Most recently, he worked as a train operator for a railroad, and he has also been employed as a heavy equipment operator, welder, and general laborer at a railroad, as a recovery coach at a mental health facility, and as a heavy equipment salesperson and store manager. (*Id.* at 1044–47, 1069–70.)  Claimant alleges that he became disabled on December 18, 2014, due to chronic obstructive pulmonary disease, narcolepsy, "Myocardial Infarction EF 30%," sleep apnea, and pulmonary hypertension. (*Id.* at 1293–94.)

Claimant protectively filed his applications for benefits on March 26, 2015. (*Id.* at 1222–47; *see id.* at 1252–57.)[3]  His claims were initially denied on November 23, 2015, and again upon reconsideration on April 11, 2016. (*Id.* at 1149–62, 1168–72.) Thereafter, on June 2, 2016, Claimant filed a written request for hearing. (*Id.* at 1173–74.)  An

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 11.
[3] The ALJ's written decision gives the application date as March 27, 2015 (Tr. at 54), but the applications are dated March 26, 2015 (*id.* at 1242, 1247).  The one-day discrepancy in the date does not appear to be material.

administrative hearing was held before an ALJ on November 20, 2017, in Dayton, Ohio. (*Id.* at 1033–76.) On May 1, 2018, the ALJ entered an unfavorable decision. (*Id.* at 51–76.) Claimant then sought review of the ALJ's decision by the Appeals Council on July 3, 2018. (*Id.* at 1214–21.) The Appeals Council denied Claimant's request for review on May 8, 2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

Claimant timely brought the present action on June 25, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 10) and a transcript of the administrative proceedings (ECF No. 11). Claimant subsequently filed his motion for judgment on the pleadings and supporting memorandum (ECF Nos. 13, 14), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 15). As such, this matter is fully briefed and ready for resolution.

### B.  Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1.  Treatment for Cardiac Conditions

On October 23, 2014, Claimant presented to the emergency room, complaining of chest pain, shortness of breath, and lightheadedness. (Tr. at 1661.) Upon physical examination, his cardiovascular system was normal. (*See id.*) Testing conducted at the hospital was also largely normal, and Claimant "refused an inpatient stress test." (*Id.* at 1662.) Claimant reported feeling better after being treated at the emergency room. (*Id.*) The attending physician opined, "His chest pain and shortness of breath was [sic] likely

related to anxiety." (*Id.*) Claimant was discharged in "stable" condition the same day and directed to follow up with his primary care provider. (*Id.*)

Claimant presented to the emergency room again on March 17, 2015, complaining of "midsternal chest pain" that worsened with exertion. (*Id.* at 1946.) A physical examination and related testing were normal. (*Id.* at 1948.) The hospital obtained a cardiac catheterization report from February 2015, which revealed a worsening cardiac lesion when compared with a previous report. (*Id.*) The report also noted that Claimant's ejection fraction was measured at 55–60% and that medication and lifestyle changes were recommended. (*Id.* at 1948, 2072.) However, Claimant stated that he had not been using his medication or his CPAP machine, and he continued to smoke. (*Id.* at 1949.) Claimant was admitted to the hospital "for further evaluation and treatment." (*Id.* at 1948.) He underwent another cardiac catheterization on March 18, 2015, which revealed "an ischemic cardiomyopathy." (*Id.* at 1955.) Claimant's ejection fraction was measured at 30%. (*Id.*) The cardiologist recommended "aggressive risk factor modification with nicotine replacement therapy," and he suggested that Claimant "be sent to cardiac rehabilitation therapy" and "be seen by a dietitian" and "pain management." (*Id.*) He also increased Claimant's medications. (*Id.*) Claimant's "chest pain resolved" after treatment, and he was discharged in "[s]table" condition on March 19, 2015. (*Id.* at 1962.)

An echocardiogram conducted on October 22, 2015, revealed "[o]verall left ventricular ejection fraction" of "50-55%." (*Id.* at 2041.) Claimant's "[l]eft ventricular systolic function" was observed to be "normal." (*Id.*) "[M]ild mitral annular calcification" and "[m]ild aortic sclerosis . . . without evidence of stenosis" were present. (*Id.*)

At an appointment with his pulmonologist on October 27, 2015, Claimant complained of "chest tightness radiating into his jaw with activity." (*Id.* at 2045.) He

4

stated that "the pain dissipated" after he used nitroglycerin. (*Id.*) Upon physical examination, Claimant's heart was observed to be normal. (*Id.*) The pulmonologist opined that Claimant's "chest discomfort . . . may be related to angina" and "scheduled an appointment with his cardiologist." (*Id.* at 2046.) Claimant was directed to go to the emergency room "[i]f he experiences pain that does not resolve with nitroglycerin" and was counseled to stop smoking. (*Id.*)

Claimant presented to his cardiologist several days later, on October 30, 2015, and the cardiologist scheduled a stress test and encouraged Claimant to consider weight loss surgery. (*Id.* at 2331.) That night, Claimant went to the emergency room, complaining of "chest pressure radiating into his jaw on the left side associated with mild shortness of breath that has been persistent." (*Id.* at 2053.) Claimant's cardiovascular system was observed to be normal upon physical examination. (*Id.* at 2056.) However, an EKG showed "some T-wave flattening in load V2 and V3 in comparison to prior EKG," and Claimant was admitted to the hospital for further treatment. (*Id.* at 2056–57.) Imaging conducted on October 31, 2015, revealed "normal" left ventricular ejection fraction at 60%. (*Id.* at 2080–81.) Claimant was discharged that day in "fair" condition. (*Id.* at 2084.)

Claimant underwent an echocardiogram on November 10, 2015, that revealed normal left ventricular function, with an ejection fraction of 50–55%. (*Id.* at 2336–37.) At his follow-up appointment with his cardiologist on November 19, 2015, the cardiologist noted that Claimant's "[c]ardiomyopathy . . . has now resolved with a normal [left ventricular] systolic function." (*Id.* at 2328.) The cardiologist further noted that Claimant "continues to be limited from his activities because of back pain[,] anxiety[,] and

deconditioning." (*Id*. at 2329.) He again recommended weight loss surgery. (*Id*. at 2328.)

Claimant returned to his pulmonologist on November 30, 2015, and complained of "chest pain radiating into his back" and shortness of breath. (*Id*. at 2349.) Claimant explained that his symptoms worsened "when he is anxious." (*Id*.) The pulmonologist ordered a CT scan of Claimant's chest, which was normal. (*Id*. at 2300, 2350.)

On January 24, 2016, Claimant was admitted to the hospital "with complaints of exertional left sided chest pain with radiation to left shoulder." (*Id*. at 3368.) A stress test conducted on January 25, 2016, revealed "no evidence of stress-induced ischemia," and Claimant's ejection fraction was measured at 54%. (*Id*.) A left-side heart catheterization revealed 50% restenosis, and Claimant's ejection fraction was rated at 55%. (*Id*.) At an appointment with his pulmonologist on February 1, 2016, Claimant reported that his chest pain resolved with medication the pulmonologist prescribed. (*Id*. at 2345.)

A short while later, on February 7, 2016, Claimant presented to the emergency room after an episode during which he lost consciousness. (*Id*. at 3360.) His cardiac-related testing was negative. (*Id*. at 3371.) Of note, Claimant's ejection fraction was calculated at 55%. (*Id*. at 3345.) Upon discharge, Claimant wore a heart monitor for several weeks, and although he "recorded multiple symptomatic events" during that time, the results of the study were "[e]ssentially unremarkable." (*Id*. at 3429.)

On April 7, 2016, Claimant again presented to the emergency room, complaining of chest pain that radiated into his jaw and left arm and persisted despite the use of six nitroglycerin pills since the onset of the symptoms. (*Id*. at 3134.) The cause of the chest pain was believed to be "likely noncardiac." (*Id*. at 3045.) Upon discharge, Claimant was

instructed to quit smoking and lose weight.  (*Id*.)  Claimant's "issues" were attributed to "poor lifestyle choices with poor diet, smoking, and lack of exercise."  (*Id*.)

Claimant returned to the emergency room on August 22, 2016, again complaining of chest pain.  (*Id*. at 2438.)  He reported "undergoing a lot of stress recently" and told the attending physician that nitroglycerin had not provided "much relief" for the pain.  (*Id*.)  Testing was largely normal, and the attending physician believed Claimant's chest pain was "noncardiac."  (*Id*. at 2461, 2463–68.)  Of note, an echocardiogram revealed "normal" systolic function and an ejection fraction of 55–60%.  (*Id*. at 2464.)  A stress test reflected a "mild fixed interior defect," but Claimant's "[l]eft ventricular function was preserved," and his ejection fraction was measured at 47%.  (*Id*. at 2467.)

On November 3, 2016, Claimant underwent a cardiac catheterization that revealed some restenosis, and a new stent was placed.  (*Id*. at 3570.)  Claimant's left ventricular function was "[p]reserved," and his ejection fraction was rated at greater than 55%.  (*Id*.)  Claimant was instructed to continue his medication regimen and "risk factor reduction and lifestyle modification."  (*Id*. at 3571.)

Claimant again presented to the emergency room complaining of chest pain on December 26, 2016.  (*Id*. at 3541.)  He related that the "stabbing" pain "came on suddenly . . . after he got up to walk inside and sit on his couch," and it "radiates to his jaw."  (*Id*.)  He stated that he took three nitroglycerin pills that did not relieve the pain.  (*Id*.)  Upon physical examination, his heart was normal, but he was admitted to the hospital "for observation."  (*Id*. at 3543, 3545.)  Other testing was negative, and Claimant's pain resolved.  (*Id*. at 3548.)  He was discharged and directed to follow up with his primary care provider.  (*Id*.)

On April 12, 2017, Claimant presented to the emergency room at the recommendation of his pain management specialist after experiencing chest pain that radiated into his left shoulder and shortness of breath for several days, with no relief from nitroglycerin. (*Id.* at 3648.) Claimant was admitted to the hospital, and he underwent an echocardiogram on April 13, 2017, that revealed normal left ventricular function with an ejection fraction of greater than 55%. (*Id.* at 3655.) Other testing was also largely normal. (*See id.* at 3657.) His chest pain was determined to be "non-cardiac," and he was discharged in "stable" condition. (*Id.* at 3653, 3658.) Claimant's primary care provider suspected that Claimant's chest pain was "[p]ossibly related to anxiety." (*Id.* at 4323.)

Claimant was again admitted to the hospital on August 16, 2017, after experiencing chest pain. (*Id.* at 4304.) A stress test "showed evidence of redistribution in the mid-basal, septal, interior and anterior suggestive of ischemia." (*Id.*) Claimant's left ventricular function was preserved, and his ejection fraction was measured at 49%. (*Id.* at 4410.) A heart catheterization "disclosed no critical stenosis." (*Id.* at 4304.) Claimant was discharged on August 19, 2017, in "stable" condition and "advised to discontinue all forms of tobacco." (*Id.*)

On November 7, 2017, Claimant presented to the emergency room, complaining of chest pain that radiated into his jaw, nausea, and shortness of breath. (*Id.* at 4302.) He reported that he had run out of his medications the week before and was unable to have them refilled. (*Id.*) Initial testing was negative, but Claimant was admitted due to "mildly elevated" troponin levels. (*Id.*) An echocardiogram "indicated normal [left ventricular] function with grade 1 diastolic dysfunction." (*Id.*) Claimant's ejection fraction was measured at 55–60%. (*Id.* at 4352.) A heart catheterization showed "mild nonobstructive luminal irregularities." (*Id.* at 4302.) Claimant was discharged on November 9, 2017,

and the attending physician "discussed [Claimant's] dire need for lifestyle changes to include complete tobacco abstinence, weight loss, daily exercise, and medication compliance." (*Id.*) Claimant was instructed to "walk as much as possible." (*Id.* at 4351.)

2. *Opinion Evidence*

a. *Dr. Julie Shott, M.D.*

In connection with a workers' compensation claim for a lower back injury he suffered on October 3, 2015, Claimant presented to Dr. Julie Shott, M.D. ("Dr. Shott"), an orthopedist, on May 11, 2016. (*Id.* at 3481–82.) Claimant reported experiencing "a dull pain" in his lower back and left leg that was "worse with standing and walking" and "relieved most when he kneels on the floor with his lumbar spine forward flexed on a chair." (*Id.* at 3481.) Claimant stated that he was attempting to stop using his cane and had been prescribed a muscle relaxer by his primary care physician but had run out. (*Id.*) He told Dr. Shott that he "feels the same as when he was at his last office visit on 03/09/2016." (*Id.*)

Upon physical examination, Dr. Shott observed that Claimant's "[s]ensation is diminished to light touch and the left lateral thigh and left lateral shin" but was "grossly intact to the right lower extremity." (*Id.*) She further noted that Claimant "has pain with extension of his lumbar spine and minimal pain with forward flexion," as well as "pain with left lateral bending and twisting." (*Id.*) Dr. Shott also observed tenderness in Claimant's left lumbar spine and left gluteus muscle but full strength in his lower extremities. (*Id.*)

Dr. Shott diagnosed Claimant with a low back strain. (*Id.*) She recommended that he "be evaluated by a spine specialist for consideration of further treatment options" and "restart his formal physical therapy." (*Id.* at 3482.) Regarding Claimant's ability to work,

Dr. Shott stated, "The patient will return to work with the restrictions of no lifting over 10 pounds, no pushing or pulling over 20 pounds of force.  Unable to operate machinery.  He is to be sitting 80% of the time and may change positions as needed." (*Id.*)

> b.  *Dr. Kenneth Fink, M.D.*

On May 8, 2017, Dr. Kenneth Fink, M.D. ("Dr. Fink"), a psychiatrist who treated Claimant when he was hospitalized for inpatient psychiatric care, wrote a letter in which he stated, "[Claimant] has multiple, significant medical conditions as well as psychiatric issues which are likely contributing to his current inability to work." (*Id.* at 3498.)  The letter is also signed by Tammy Damron, M.A., a counselor.  (*Id.*)

> c.  *State-Agency Medical Consultants*

At the initial determination level, state-agency medical consultant Bradley J. Lewis, M.D. ("Dr. Lewis") performed a physical residual functional capacity ("RFC") assessment of Claimant.  (*Id.* at 1089–92, 1105–07.)  Regarding Claimant's exertional limitations, Dr. Lewis opined that Claimant could lift twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was unlimited in his ability to push or pull.  (*Id.* at 1089, 1105–06.)  As to Claimant's postural limitations, Dr. Lewis opined that Claimant could frequently climb ramps and stairs and crawl and occasionally climb ladders, ropes, or scaffolds, stoop, or crouch.  (*Id.* at 1090, 1106.)  He further opined that Claimant was unlimited in his ability to balance and kneel.  (*Id.*)  Dr. Lewis opined that Claimant had no manipulative, visual, or communicative limitations.  (*Id.*)  And with respect to Claimant's environmental limitations, Dr. Lewis opined that Claimant should avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases,

poor ventilation, etc. but could have unlimited exposure to wetness, noise, vibration, and hazards. (*Id.* at 1090–91, 1106–07.)

State-agency medical consultant Stephen Sutherland, M.D. ("Dr. Sutherland") performed a physical RFC assessment of Claimant at the reconsideration level. (*Id.* at 1124–26, 1141–43.) As to Claimant's exertional limitations, Dr. Sutherland opined that Claimant could occasionally lift twenty pounds and frequently lift ten pounds, stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was unlimited in his ability to push or pull. (*Id.* at 1124, 1141.) With respect to Claimant's postural limitations, Dr. Sutherland opined that Claimant could climb ramps and stairs and crawl frequently, climb ladders, ropes, or scaffolds, stoop, and crouch occasionally, and was unlimited in his ability to balance and kneel. (*Id.* at 1125, 1142.) Dr. Sutherland opined that Claimant had no manipulative, visual, or communicative limitations. (*Id.*) And regarding Claimant's environmental limitations, Dr. Sutherland opined that he should avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases, poor ventilation, etc. but could have unlimited exposure to wetness, noise, vibration, and hazards. (*Id.*)

*3. Vocational Expert Hearing Testimony*

At the hearing, the ALJ asked the vocational expert ("VE") to "assume a hypothetical individual of the claimant's age, education and work history" who "is limited to light exertional work with no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs . . . occasional stooping, kneeling, crouching, crawling, no more than occasional exposure to extreme heat and cold as well as humidity" or "to fumes, dusts, gases, odors and poorly ventilated areas," and "[n]o work at unprotected heights or with dangerous machinery." (*Id.* at 1070–71.) He further stipulated that the individual

"would . . . have the ability to change positions every 30 minutes for . . . two to three minutes at a time without leaving the work station" and would be "limited to simple, routine tasks in a static work environment with few changes in routine" and "[n]o fast-paced work or strict production quotas, and only occasional interactions with the public, coworkers and supervisors."  (*Id.* at 1071.)  The VE testified that the hypothetical individual would be unable to perform Claimant's past work but could work as an inspector, sorter, or routing clerk.  (*Id.* at 1071–72.)  She explained that she "erode[d] the number [of jobs available] for the ability to change position" for the inspector and sorter jobs.  (*Id.* at 1071.)

The ALJ next asked the VE to imagine a hypothetical individual with the same limitations as the first hypothetical individual, except the second hypothetical individual would be limited to the sedentary exertional level.  (*Id.* at 1072.)  The VE testified that such an individual could work as a sorter, inspector, or document preparer.  (*Id.*)  The ALJ then asked the VE whether the individual could perform these jobs if he or she were "absent from work at least two times per month."  (*Id.*)  The VE responded, "based on my experience there would be no competitive work with this hypothetical."  (*Id.*)

The ALJ modified his hypothetical to posit that "the person has the ability to change positions every 30 minutes" and "would be able to get up, move around, walk around for a minute or two each time . . . as opposed to remaining at the work station."  (*Id.*)  The VE testified that "the inspector and sorter positions both at the light and sedentary levels would be eliminated," but "[t]he other two positions would remain."  (*Id.* at 1073.)  Then, the ALJ asked the VE about the impact on work if "getting up and walking away would cause the person to be off task . . . at least 30 minutes or so" per day.  (*Id.*)  The VE responded that it "would be too much time off task . . . and work preclusive."  (*Id.*)

12

The ALJ concluded his questioning of the VE by asking her if her testimony was consistent with the *Dictionary of Occupational Titles*. (*Id*.) She stated that it was, but "the DOT does not address absences, off task and the ability to change positions." (*Id*.) The VE explained that her testimony about those questions was "base[d] on [her] experience in job placement over 14 years." (*Id*.)

Next, Claimant's representative asked the VE if the jobs she listed were "non-production level jobs," and the VE replied that they were. (*Id*. at 1073–74.) Claimant's representative confirmed that "even in these jobs there's a certain amount of work that's expected to be completed daily or weekly" and asked the VE if work would be available for a hypothetical individual who "routinely miss[ed] that objective." (*Id*. at 1074.) The VE answered that routinely missing the objective would be work-preclusive. (*Id*.)

Claimant's representative also asked the VE if a hypothetical individual who "simply needed two additional 15 minute breaks" would be excluded from work. (*Id*.) The VE testified, "Yes, if that was a routine thing two additional routine breaks would be work preclusive." (*Id*.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no

finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's [RFC]" before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the

ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 56.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (*Id.*) He found that

Claimant's coronary artery disease status-post stenting, history of cardiomyopathy, chronic obstructive pulmonary disease, obesity, obstructive sleep apnea with periodic limb movement disorder, essential and pulmonary hypertension, degenerative disc disease and joint disease of the spine with lumbar radiculopathy, depressive disorder, and anxiety disorders constituted "severe" impairments.  (*Id*. at 56–57.)  However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*. at 57–59.)  Upon assessing Claimant's RFC, the ALJ determined that Claimant is able

> to perform light work . . . except subject to the following limitations: (1) the ability to change positions for 2-3 minutes every 30 minutes while remaining at workstation; (2) no climbing of ladders, ropes, or scaffolds; (3) occasional climbing of ramps and stairs; (4) occasional stooping, kneeling, crouching, and crawling; (5) no more than occasional exposure to extreme heat and cold and humidity; (6) no more than occasional exposure to fumes, dust, gases, odors, and poorly ventilated areas; (7) no work at unprotected heights or with dangerous machinery; (8) limited to simple, routine tasks; (9) in a static work environment with few changes in routine; (10) no fast paced work or strict production quotas; and (11) only occasional interaction with the public, coworkers, supervisors.

(*Id*. at 59.)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was unable to perform his past relevant work.  (*Id*. at 66.)  He noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability."  (*Id*. at 66–67.)  Because

the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a VE to aid in his finding that Claimant is capable of working as an inspector, sorter, or routing clerk. (*Id*. at 67.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from December 18, 2014, through the date of this decision." (*Id*. at 68.)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id*. (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id*. (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant argues that the ALJ improperly concluded that his coronary artery disease and related conditions did not constitute a listed impairment at the third step of the sequential evaluation process. (ECF No. 14 at 3–4.) He further asserts that the ALJ erroneously assessed his RFC by failing to give appropriate weight to the opinions of his treating physicians and by impermissibly substituting his judgment for that of the state-agency medical consultants. (*Id.* at 6–10.) As a result, Claimant contends, the hypotheticals the ALJ posited to the VE did not adequately reflect his limitations, and the ALJ erred by relying on them. (*Id.* at 10–12.) Claimant asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 13–14.) The Commissioner responds that Claimant's conditions do not satisfy Listing 4.02 and that the ALJ's RFC assessment and his corresponding hypotheticals to the VE are supported by substantial evidence. (ECF No. 15 at 13–19.)

### A. Listing 4.02

Claimant first argues that his heart conditions satisfy Listing 4.02. (ECF No. 14 at 3–4.) At the third step of the sequential evaluation process, the ALJ must evaluate whether any of the claimant's impairments or a combination thereof satisfies or is the medical equivalent of a listed physical or mental impairment. *Radford v. Colvin*, 734 F.3d 288, 290–91 (4th Cir. 2013) (citing *Hancock v. Astrue*, 667 F.3d 470, 472–73 (4th Cir. 2012). The claimant bears the burden to demonstrate that his condition meets a Listing. *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (citing *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015)). The

Listings, "if met, are conclusive on the issue of disability." *Radford*, 734 F.3d at 291 (quoting *McNunis v. Califano*, 605 F.2d 743, 744 (4th Cir. 1979)).

Here, although the ALJ determined that "[t]he evidence does not establish the presence of findings that would meet or equal any listed physical impairment," he did not specifically discuss Listing 4.02 or any other listed physical impairment. (Tr. at 57–59.) Listing 4.02 applies to "Chronic heart failure while on a regimen of prescribed treatment," with "Cardiomegaly or ventricular dysfunction" and "pulmonary or systemic congestion" or "limited cardiac output." 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 4.00D2, 4.02. It is satisfied when there is a "Medically documented presence" of systolic or diastolic failure that results in either "Persistent symptoms of heart failure which very seriously limit the ability to initiate, sustain, or complete activities of daily living," "Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period," or "Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less." *Id.* § 4.02.

The Commissioner argues that Claimant's cardiac conditions do not meet or equal Listing 4.02 because the March 2015 cardiac catheterization indicating an ejection fraction of 30% was performed during an emergency room visit after a period during which Claimant was noncompliant with treatment, other testing conducted between 2015 and 2017 revealed a much higher ejection fraction percentage, and Claimant did not have "persistent symptoms of heart failure" that limited his daily activities. (ECF No. 15 at 14–15.) The Commissioner may be correct that the Listing is not satisfied—and likely is correct, considering that Claimant has not meticulously compared the medical evidence of record to the elements of the Listing in accordance with his burden to show that it is met (*see* ECF No. 14 at 3–4)—but this determination is not for the undersigned to make

20

in the first instance. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (per curiam) (holding that district court erred by reviewing ALJ's conclusion that claimant did not meet Listing where ALJ did not explain why Listing not met).

As the Commissioner acknowledges, there is evidence that Claimant's ejection fraction was measured at 30%—at heart failure levels—on one occasion in March 2015, and other studies conducted between 2015 and 2017 showed an ejection fraction calculated at anywhere from 47% to 60%. (ECF No. 15 at 14.) But Claimant was continuously treated for his cardiac conditions during the relevant period, he often went to the emergency room complaining of chest pain, and he underwent a re-stenting procedure in November 2016 due to restenosis. Even though later testing revealed a much higher ejection fraction within normal limits, Claimant's treatment was clearly influenced by the March 2015 results indicating a 30% ejection fraction. (*See, e.g.*, Tr. at 2075.) Given the extent of Claimant's heart conditions and his treatment for them, the ALJ should have addressed Listing 4.02, even to explain that it was not satisfied. *Mathis v. Astrue*, 723 F. Supp. 2d 848, 850 (E.D.N.C. 2010) (remanding matter to Commissioner because ALJ did not consider Listing 4.02 despite evidence of heart condition). Absent this discussion, the undersigned cannot review the ALJ's conclusions. *See Radford*, 734 F.3d at 296 ("Given the depth and ambivalence of the medical record, the ALJ's failure to adequately explain his reasoning precludes this Court and the district court from undertaking a 'meaningful review' of the finding that Radford did not satisfy Listing 1.04A.").

In sum, where, as here, the record indicates that a claimant's condition may satisfy the criteria of a listed impairment, the ALJ should at least discuss why it does not. *Morgan v. Colvin*, No. 7:13-cv-279-BO, 2014 WL 6473525, at *2 (E.D.N.C. Nov. 18, 2014)

("The ALJ's failure to consider Listing 12.05C in this instance, where there is obviously evidence that may support the listing, is clear error."). But the ALJ in this case did not do so. (Tr. at 57–59.) The undersigned **FINDS** that this was error.

### B. Opinion Evidence/Subjective Complaints

Claimant also challenges the weight the ALJ assigned to the opinions of Dr. Shott, Dr. Fink, and the state-agency medical consultants. (*See* ECF No. 14 at 6–10.)[4] When determining whether a claimant is disabled, the ALJ must "evaluate and weigh medical opinions" by considering, among other factors, "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam). A treating physician's opinion about a claimant's condition may be given "greater weight" than that of a non-treating physician "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). "[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Id.*

---

[4] The undersigned acknowledges that upon remand to the Commissioner, the ALJ may perform a new RFC assessment and construct new hypotheticals for the VE, rendering moot any errors with the previous written decision or hearing. But the undersigned nonetheless addresses Claimant's additional assignments of error in the event that the presiding District Judge disagrees with the undersigned's findings as to Claimant's arguments about the ALJ's error at step three of the sequential evaluation process.

In assigning "little weight" to Dr. Shott's opinion that Claimant could return to work at essentially the sedentary exertional level as of May 2016, the ALJ explained that her opinion was not "fully consistent with the claimant's activities of daily living and testimony or with his treating physicians' pleas that he get more exercise and walk as much as he could tolerate." (Tr. at 66.) In the same section of his written decision, the ALJ had already discussed this evidence more specifically. (*See id.* at 64; *see also id.* at 59–63.) The ALJ also pointed out that "Dr. Shott was only evaluating one aspect of [Claimant's] health for work-related purposes; therefore, it appears to be a very self-limited opinion." (*Id.* at 66.) Indeed, the ALJ noted that Dr. Shott examined Claimant "[i]n conjunction with his Workers' Compensation claim for back injury." (*Id.*) The ALJ's reasons for discounting Dr. Shott's opinion are permissible. *See Woodard v. Colvin*, No. 1:14-cv-882, 2016 WL 1595387, at *4 (M.D.N.C. Apr. 20, 2016) ("Where a plaintiff's statements regarding her daily activities, medical treatment evidence, or other opinion evidence contradict a medical opinion, the ALJ may afford the opinion less weight."), *adopted by* 2016 WL 3512211 (M.D.N.C. Jun. 22, 2016); *see also Parker v. Comm'r of Soc. Sec.*, No. 6:16-cv-58, 2018 WL 1309741, at *6 (W.D. Va. Mar. 13, 2018) (concluding that ALJ properly accorded "little weight" to opinion when examiner had less than "full picture" of claimant's impairments).

The ALJ also gave "little weight" to Dr. Fink's statement that Claimant's medical conditions rendered him unable to work, reasoning that the statement "is unsupported and too vague to offer any insight into the claimant's [RFC]" and "is not a medical opinion under the regulations, but rather, an administrative finding dispositive of the case." (Tr. at 66.) The ALJ is entitled to reject an opinion because it speaks to an issue reserved to

the Commissioner or because it fails to "provid[e] a reasoned explanation" for the conclusions expressed. *Thompson v. Astrue*, 442 F. App'x 804, 808 (4th Cir. 2011).

In sum, "while an ALJ may not reject medical evidence for no reason or for the wrong reason, an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the [relevant factors], if he sufficiently explains his rationale and if the record supports his findings." *Vest v. Colvin*, No. 2:15-cv-05886, 2016 WL 5334668, at *3 (S.D.W. Va. Sept. 22, 2016) (quoting *Wireman v. Barnhart*, No. 2:05cv00046, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006)). The ALJ is obligated to discuss "which evidence [he] found credible and why" and to explain "why the opinions merit th[e] weight" he assigned to them. *Radford*, 743 F.3d at 295. In this case, he did so. Therefore, the undersigned **FINDS** that the ALJ adequately evaluated Dr. Shott's and Dr. Fink's opinions.

Claimant also suggests that the ALJ erred by according "moderate weight" to the opinions of the state-agency medical consultants, whose opinions, according to Claimant, outlined "a broad range of limitations which erode [Claimant's] occupational base." (ECF No. 14 at 9–10.) But that argument makes no sense because although the state-agency medical consultants opined that Claimant "is capable of a limited range of light exertional work," the ALJ explained that he gave their opinions less weight than he otherwise would have "because evidence received at the hearing level shows that the claimant has more restrictions than previously determined and the claimant's subjective complaints were not adequately considered in regards to his cardiopulmonary issues." (Tr. at 65.) As a result, the ALJ's RFC assessment is more favorable to Claimant than those of the state-agency medical consultants. (*Compare id.* at 59, *with id.* at 1089–91, 1124–25.) It is

puzzling that Claimant would assert that the ALJ should have adopted these less-favorable RFC assessments.  (*See* ECF No. 14 at 9.)

Instead, Claimant appears to be arguing that the ALJ improperly evaluated his subjective complaints by substituting his own judgment for that of Claimant's treating providers.  (*Id.* at 9–10.)  As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments."  *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)).  To evaluate the disabling effect of an individual's symptoms, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed."  *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  An individual's subjective complaints about her symptoms are relevant to the latter determination.  *See id.* §§ 404.1529(c)(3), 416.929(c)(3).  Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant."  *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (per curiam) (quoting *Craig*, 76 F.3d at 591).  The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole."  *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

Here, the ALJ found that although Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the evidence." (Tr. at 63.) The ALJ pointed to Claimant's representations about his daily activities and concluded that they were "not entirely consistent with [Claimant's] allegations of an inability to perform work activity." (*Id.* at 64.) He also considered Claimant's statements about his cardiac condition and his back pain and contrasted them with the "mild" objective findings related to those impairments. (*Id.*) And the ALJ explained that he included certain restrictions in his RFC assessment to account for Claimant's reports about the "precipitating and aggravating factors" associated with his conditions, but he noted "that the claimant's treating physicians have repeatedly advised him to get daily exercise and walk as much as possible, and they have reportedly limited him to lifting up to 20 pounds, so it does not appear necessary to restrict him to the sedentary exertional level." (*Id.*) The ALJ also noted that Claimant's medications appeared to control his symptoms "without significant, ongoing side effects when taken compliantly," which "suggests that the claimant may have more functional ability than is consistent with the allegations of severity." (*Id.* at 64–65.)

The portion of the ALJ's analysis to which Claimant seems to object is the ALJ's discussion of Claimant's efforts "to relieve his symptoms by non-medicinal methods." (Tr. at 65.) (*See* ECF No. 14 at 9–10.) The ALJ "acknowledge[d] that these efforts support the claimant's allegations as to severity and chronicity." (Tr. at 65.) However, the ALJ observed that Claimant "has failed to make the lifestyle changes that have been extensively and repeatedly recommended by his treating sources, including exercise, weight loss, and smoking cessation," which "suggests that the symptoms may not have

been as limiting as the claimant has alleged in connection with this application, or, alternatively, that the claimant is not willing to explore all options that may assist in improving his health." (*Id.*) The ALJ reasoned, "This lessens the persuasiveness of the claimant's statements regarding the symptoms and limitations experienced." (*Id.*)

Contrary to Claimant's contention, the ALJ's statements were plainly not based on his own judgment about Claimant's impairments; rather, they reflect the recommendations of Claimant's treating physicians. (*Id.*) The ALJ discussed these recommendations in his review of the medical evidence of record. (*Id.* at 60–63.) And Claimant's noncompliance with his prescribed treatment—which, notably, Claimant does not challenge (*see* ECF No. 14 at 9–10)—may be considered in conjunction with other factors in the ALJ's evaluation of his subjective complaints. *Dunn v. Colvin*, 607 F. App'x 264, 275–76 (4th Cir. 2015). Accordingly, the undersigned **FINDS** that the ALJ properly considered it in this case.

### C.  VE Hypotheticals

Finally, Claimant argues that the ALJ improperly failed to discuss in his decision all the hypotheticals presented to the VE during the hearing, including the questions posited by Claimant's representative. (*See* ECF No. 14 at 10–12.)[5] But—as illustrated by the absence of any legal support for such a proposition in Claimant's brief—no such rule exists. *See Woodlief v. Berryhill*, No. 5:16-cv-191-FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017) (rejecting claimant's argument "that the ALJ erred by asking the VE a

---

[5] Claimant also argues that the VE "arbitrarily eroded the occupational base by an indeterminable number of positions under each representative job" but did not "disclose the methodology, ratio or any other rationale for this finding." (ECF No. 14 at 11.) To the contrary, the VE explained that her testimony regarding "the ability to change positions" was based on her "experience in job placement over 14 years." (Tr. at 1073.) The ALJ may rely on the VE's testimony about the number of positions available to the extent the VE "based this information on her expert experience and first-hand observations." *Baron v. Astrue*, No. 6:09-cv-00035, 2010 WL 3909926, at *3–4 (W.D. Va. Sept. 30, 2010). As such, Claimant's argument is without merit.

hypothetical question involving a sit/stand option without expressly stating why such an option was not needed in the RFC"), *adopted by* 2017 WL 4164076 (E.D.N.C. Sept. 20, 2017).

The ALJ's hypothetical questions to the VE "need only incorporate those limitations which are credibly established in the record." *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)). The ALJ may present alternative hypotheticals to the VE, "even if they are contradictory," and may "determine after the hearing which hypothetical is supported by the record evidence." *Hart v. Berryhill*, No. 5:18-cv-208-D, 2019 WL 1759741, at *6 (E.D.N.C. Mar. 26, 2019) (quoting *Woodlief*, 2017 WL 9478528, at *5); *see Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (per curiam) (table), 1998 WL 559728, at *2 (stating that hypothetical questions that alternatively included claimant's subjective complaints and did not include them "were entirely proper" because hypothetical not equivalent to "findings of fact"). To that end, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)).

However, to require the ALJ to explain in detail why a particular hypothetical was rejected is simply redundant of the RFC assessment. For instance, Claimant asserts that

the ALJ was obligated to include Dr. Shott's and Dr. Fink's opinions in his hypothetical questions to the VE (ECF No. 14 at 9), but as the undersigned has already explained, the ALJ properly rejected their opinions as part of his RFC assessment.  Thus, there is no reason for him to discuss their opinions a second time in order to elaborate on why he did not adopt the VE's testimony with regard to a certain hypothetical at step five.  Moreover, the questions Claimant's representative asked the VE were based not on Dr. Shott's and Dr. Fink's opinions but on Claimant's treatment for his cardiac conditions and his own statements about his functional abilities.  (*See* Tr. at 1074–75.)  The ALJ reviewed the medical evidence associated with Claimant's cardiac conditions and evaluated Claimant's subjective complaints as part of the RFC assessment.  (*Id*. at 59–65.)  Accordingly, while the ALJ made no specific reference to each hypothetical question posed to the VE, he clearly explained in his RFC assessment why additional limitations were not supported by the record.  The undersigned therefore **FINDS** that the ALJ properly relied on the VE's testimony in this case.

### IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request to reverse the Commissioner's decision (ECF No. 13), **DENY** the Commissioner's request to affirm his decision (ECF No. 15), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter to the Commissioner for further proceedings.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the

date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: May 14, 2020

Dwane L. Tinsley
United States Magistrate Judge